**Angel URENA, Petitioner,**

v.

**William LAPE, Acting Superintendent of Clinton Correctional Facility, Respondent.**

**No. 04 Civ. 8016(VM).**

United States District Court, S.D. New York.

June 15, 2005.

Angel Urena, Marcy, NY, pro se.

## DECISION AND ORDER

MARRERO, District Judge.

*Pro se* petitioner Angel Urena ("Urena") filed this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (" § 2254"). Urena was convicted in the New York State Supreme Court, New York County (the "trial court"), of criminal sale of a controlled substance in the third degree, in violation of N.Y. Penal Law § 220.39(1), and criminal sale of a controlled substance in or near school grounds, in violation of N.Y. Penal Law § 220.44(2). He was sentenced, as a second felony offender, to concurrent, indeterminate prison terms of four and one-half to nine years on each count. In this petition for a writ of habeas corpus, Urena argues that he was deprived of his due process right to a fair trial, allegedly on the basis of (1) the trial court's admission of evidence of uncharged crimes; (2) prosecutorial misconduct during summation; and (3) the trial court's failure to address a jury question during deliberations. For the reasons set forth below, Urena's petition is denied.

## I. BACKGROUND [1]

The evidence at Urena's trial established the following facts. On September 24, 2000, New York City Police Department ("NYPD") detectives Stephen Minogue ("Minogue") and Jose Rivera ("Rivera") observed Urena selling narcotics at the intersection of Nagle Avenue and Academy Street in Manhattan, 752 feet from St. Jude Elementary School. Detective Libby Guzman ("Guzman") arrested Urena one block away from this intersection, and he was subsequently charged with the crimes for which was convicted.

Urena's arrest resulted from the efforts of an NYPD surveillance team composed of eight officers. Minogue and Rivera es-

---

1. The factual summary that follows derives from the following documents in the record: Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus, dated Sept. 20, 2004 ("Pet."); Memorandum of Law in Opposition to Petition for a Writ of Habeas Corpus, dated Mar. 31, 2005; Trial Transcript of *People v. Urena*, Ind. No. 6464–00, beginning Dec. 7, 2001, Supreme Court, New York County, Trial Term, Part 82 ("Tr."); Brief for Defendant– Appellant, *People v. Urena*, 306 A.D.2d 137, 760 N.Y.S.2d 319 (1st Dep't. 2003) ("State Urena Br."), attached as Ex. A. to Declaration of Luke Martland, dated Mar. 31, 2005 ("Martland Decl."); Brief for Respondent, *Urena*, 760 N.Y.S.2d at 319, attached as Ex. B to Martland Decl. Except where specifically referenced, no further citation to these sources will be made.

tablished an observation post from an unmarked vehicle that was parked across the street from the Nagle Avenue and Academy Street intersection, a location that in the past had been the site of numerous drug sales and drug arrests. They were 112 feet away from Urena and had been in their position for eighty minutes.

The detectives focused on Urena because they observed separate transactions between Urena and two individuals, each of whom approached Urena, engaged in a transaction in which Urena gave the individual an object from his pocket in exchange for money, and then walked away. The first individual arrived in a truck, parked, got out, and walked directly to Urena. This man gave Urena money, and Urena pulled a small object from his pocket and gave it to the man, who returned to his truck and drove away. Minogue radioed a description of the man and his truck to the field team, but the team could not locate the vehicle. Some time later, a second man walked directly to Urena. He handed money to Urena, and Urena handed a small object to him. The man then walked away. Again, Minogue radioed a description of the man to other officers, but they were unable to locate him.

Urena was not charged with criminal activity relating to his interactions with these first two individuals, but he was charged with selling crack cocaine to Harriet James ("James"). During the eighty minutes in which the detectives were positioned in their vehicle, James also approached Urena and handed him what appeared to be money. Urena then handed James a small object. Minogue testified that he could not see what Urena handed to James; Rivera testified that although he could not see what Urena handed to James, he could discern that it was a "small, shiny object." (Tr. at 92, 128, 142, 147.) James placed the object in her right front pocket and walked away. She walked past the detectives' vehicle, and Rivera stopped her. From James's right front pocket, Rivera recovered a small tinfoil package containing crack cocaine along with a crack pipe.

After this encounter, Minogue radioed Urena's description to the other officers, and Guzman arrested him one block away from the corner where the three transactions occurred. Guzman found currency in Urena's right front pocket and a pager on his waistband.

The first trial resulted in a mistrial because the jury could not unanimously agree on a verdict. (Trial Transcript of *People v. Urena*, Ind. No. 6464–00, beginning Oct. 24, 2001, Supreme Court, New York County, Criminal Term, Part 72, at 14–16.)

New proceedings began in December of 2001. Three aspects of these trial proceedings are relevant to Urena's habeas petition: (1) over defense objections, the trial court allowed the introduction of evidence about the two earlier interactions between Urena and alleged narcotics buyers;[2] (2) during the prosecutor's summation, defense counsel objected to the repeated use of the phrase "don't fall for that" (Tr. at 236), which the prosecution repeated five times (Tr. at 236, 238, 244, 246, 248); and (3) in a note to the judge during its deliberations which contained multiple questions, the jury inquired, "Can we find [Urena] guilty if we think the detectives did not see the actual piece of tinfoil handed to Harriet James?" (Tr. at 288.) The judge decided that he could not answer this question with a "yes, no" answer and responded in this manner. (Tr.

---

**2.** The trial judge conducted most of the pretrial evidentiary hearings off the record, including the arguments relating to the introduction of the prior, uncharged crimes. (State Urena Br. at 12 n. 8.)

at 289–91.) Five minutes after the judge answered the jury's questions, the jury returned a verdict convicting Urena of both charges. (Tr. at 309, 310–11.)

Urena appealed his conviction to the New York Supreme Court, Appellate Division, First Department (the "Appellate Division"). He presented three arguments, each asserting that the trial court's errors denied him his constitutional right to a fair trial. First, Urena argued that the trial court's admittance of the evidence of uncharged alleged criminal acts was highly prejudicial because it enabled the jury to infer that he had the propensity to commit the crime. (State Urena Br. at 1–2.) Although not at issue here, Urena also argued that the admission of the crack pipe found on James into evidence was similarly prejudicial. *Id.* Second, Urena contended that the prosecutor made "prejudicial and disparaging remarks" during her summation, implying that the "defense counsel was trying to deceive the jurors … stating numerous times, 'don't fall for that.'" (State Urena Br. at 2.) Finally, he argued that the trial judge refused to respond meaningfully to the jury's question, thus denying Urena his constitutional right to a fair trial. (State Urena Br. at 2.)

The Appellate Division unanimously affirmed the conviction on both counts. *People v. Urena*, 306 A.D.2d 137, 760 N.Y.S.2d 319 (App.Div. 1st Dep't 2003) (*"Urena II"*). The Appellate Division stated that the testimony regarding the immediately preceding uncharged drug sales was properly admitted and was relevant "since its probative value in providing a complete and coherent narrative of the offense, including an explanation of why the police targeted [Urena] for continuing observation, outweighed any prejudicial effect." *Id.* at 319. The court also determined that the remarks made in the summation "were responsive to defense arguments and did not exceed the broad bounds of rhetorical comment permissible in closing argument." *Id.* Finally, the Appellate Division held that the trial court "provided a meaningful response when it properly advised the deliberating jury that its question regarding the interpretation of circumstantial evidence could not be answered with the simple 'yes' or 'no' called for by the question." *Urena II*, 760 N.Y.S.2d at 319. The court also recognized that "[i]n view of the overwhelming evidence of defendant's guilt, the court's response could not have caused any serious prejudice." *Id.* The New York Court of Appeals issued a certificate denying leave to appeal on September 23, 2003. *People v. Urena*, 100 N.Y.2d 625, 767 N.Y.S.2d 409, 799 N.E.2d 632 (2003).

Urena timely filed this *pro se* petition for a writ of habeas corpus pursuant to § 2254, raising the same issues he brought before the Appellate Division with the exception of his challenge to the admission of the crack pipe, following the Court of Appeals' denial of leave to appeal.

## II. *DISCUSSION*

### A. *STANDARD OF REVIEW*

A petitioner in custody pursuant to a state court judgment is entitled to habeas relief only if he can show that his detention violates the United States Constitution or laws or treaties of the United States. *See* 28 U.S.C. § 2254(a). Pursuant to 28 U.S.C. § 2254(d)(1), which was introduced in its current form by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1218, this Court may grant habeas relief to a petitioner whose claims were decided on the merits only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the

evidence presented in the State court proceeding." § 2254(d); *see also Williams v. Taylor*, 529 U.S. 362, 409, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (noting that under § 2254(d), the test is whether "the state court's application of clearly established federal law was objectively unreasonable"); *Eze v. Senkowski*, 321 F.3d 110, 120–21 (2d Cir.2003) (holding that the post-AEDPA standard applies to all claims "adjudicated on the merits in [s]tate court proceedings") (quoting § 2254(d)).

 A state court adjudicates a petitioner's federal claim "on the merits," and thus triggers the highly-deferential AEDPA standard of review, when it: (1) disposes of the claim on the merits; and (2) reduces its disposition to judgment. *See Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001). In so doing, the state court need not explicitly refer to either the particular federal claim or to any federal case law. *See id.* The only requirement is that the claim be finally resolved, with res judicata effect, on substantive rather than procedural grounds. *See id.* at 311. *Urena II's* disposition of Urena's claims indicates that the State has adjudicated his claims on the merits. *See* State Urena Br. (raising constitutional claims); *Urena II*, 760 N.Y.S.2d at 319–20 (rejecting challenges to conviction based on admission of uncharged crimes evidence, prosecutorial summation, and response to jury question, and stating, "We have considered and rejected defendant's remaining claims.") Thus, the § 2254(d) standard of review applies to Urena's claims.

 It is undisputed that Urena has exhausted his state remedies by presenting his federal constitutional arguments to each state court that reviewed his claims. *See* § 2254(b)(1)(A); *Jones v. Keane*, 329 F.3d 290, 295 (2d Cir.2003) ("Exhaustion requires a petitioner fairly to present the federal claim in state court.") His claims in the instant petition are thus ripe for the Court's review.

### B. *EVIDENCE OF UNCHARGED CRIMES*

Urena argues that the admission of evidence of the two observed transactions, which he characterizes as evidence of "alleged" uncharged crimes, violates state law and his due process right to a fair trial. *See* U.S. Const. amend. XIV, § 1.

#### 1. *Admittance of Evidence as a Matter of State Law*

 Urena's claim based on state law questions the propriety of the trial court's determination that the probative value of the evidence, which was used to "complete the story of the crime" by explaining why the police focused their attention on Urena, outweighed any prejudice Urena may have suffered as a result of the introduction of the evidence. This is the standard that the state was required to satisfy under New York evidentiary law. *See People v. Till*, 87 N.Y.2d 835, 637 N.Y.S.2d 681, 661 N.E.2d 153 (1995) (applying this standard). To the extent that Urena's challenge to the admission of evidence of uncharged crimes seeks to question the state's interpretation and application of state evidentiary law, his challenge must fail. The United States Supreme Court has emphasized that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67–68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991); *see also Howard v. Walker*, 406 F.3d 114, 121 (2d Cir.2005) ("A claim that a state conviction was obtained in violation of state law is not cognizable in the federal court.")

The trial court and the Appellate Division both determined that the evidence of uncharged crimes was properly admitted

as a matter of state law. *See Urena II,* 760 N.Y.S.2d at 319. This Court will not "independently determine the appropriateness of whether or not that evidence should have been admitted under New York State evidentiary rules." *Allaway v. McGinnis,* 301 F.Supp.2d 297, 300 (S.D.N.Y.2004). Such an understanding conforms with the view that "it is not [the] court's duty to balance the probative value against the unfair prejudice because the Due Process Clause does not permit federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules." *Id.* (quoting *Anderson v. Sternes,* 243 F.3d 1049, 1055 (7th Cir.2001)) (internal quotation marks omitted). Consequently, this challenge based on state law must fail.

### 2. *Due Process Clause*

■ If this Court instead interprets Urena's challenge as alleging a due process violation (*see* Pet. at 5 (alleging that the introduction of alleged uncharged crimes evidence resulted in "blatant disregard to petitioner's constitutional rights")), he may obtain habeas relief only if the trial court's decision to admit evidence of Urena's immediately prior or contemporaneous actions rendered his trial so fundamentally unfair as to deny him his right to due process of law. *See Estelle,* 502 U.S. at 75, 112 S.Ct. 475; *Dunnigan v. Keane,* 137 F.3d 117, 125 (2d Cir.1998); *Bonet v. McGinnis,* No. 98 Civ. 6529, 2001 WL 849454, at *3 (S.D.N.Y. July 27, 2001). Even if the evidence were admitted erroneously, "introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.'" *Dunnigan,* 137 F.3d at 125 (quoting *Dowling v. United States,* 493

U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).

■ There is no evidence in the record suggesting that the admission of evidence concerning the two uncharged transactions denied Urena due process of law. The trial court correctly instructed the jury that it was not permitted to consider this evidence as proof of Urena's propensity to commit crimes. Rather, as the trial court explained, it could be considered only to complete the story of the crime by explaining why the police officers began monitoring Urena:

> I have allowed the People to introduce evidence that [Urena] was seen exchanging certain items for money [with] two individuals other than Ms. James. As I told you during the trial, the fact that the defendant was involved in this activity, is no proof whatsoever that [Urena] is the person who possesses a propensity or predisposition to commit crimes. This testimony was not offered for such purpose and must not be considered by the jury for that purpose. Instead, the People offered this evidence to show why the police were watching the defendant and in order to provide a full and complete background surrounding [Urena's] arresting [sic]. I instruct you that such testimony must be considered for those purposes only.[3]

(Tr. at 272–73.) *Cf. Estelle,* 502 U.S. at 75 n. 5, 112 S.Ct. 475 (noting that the Supreme Court has not yet determined whether admission of "prior crimes" to prove propensity to commit crimes would violate the Due Process Clause). Critical elements of these proper instructions were reiterated in response to a jury note. (Tr. at 288, 304–306.) This Court must assume that jurors understand and follow limiting

---

**3.** These instructions corrected any initial error that may have been committed by the trial court when introducing the uncharged crime

evidence to the jury. *See* Tr. at 64 (erroneously describing purpose of testimony); *id.* at 65 (correcting error).

instructions. *See Zafiro v. United States,* 506 U.S. 534, 540, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993); *Roldan v. Artuz,* 78 F.Supp.2d 260, 281 (S.D.N.Y.2000). After receiving these instructions concerning the testimony relating to uncharged crimes, the jury was able to reach a unanimous verdict, presumably having understood the limited purpose for which the evidence could be used.

Viewing the evidence of alleged uncharged crimes in light of the proper instructions before the jury, the admission of this testimony cannot constitute a due process violation. Consequently, Urena is not entitled to habeas relief on this basis.

B. *PROSECUTION'S SUMMATION*

Urena next argues that the prosecutor's repeated use of the phrase "don't fall for that" during summation deprived him of a right to a fair trial. (Pet. at 6.) He claims that by permitting this phrase to be repeated by the prosecutor, the trial court acquiesced to prosecutorial denigration of defense counsel and the defense's theory of the case. (*Id.*)

■ Urena's claim that these remarks violated the Constitution can only succeed if he can demonstrate that the prosecutor's remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)); *United States v. Elias,* 285 F.3d 183, 190 (2d Cir.2002). Prosecutorial misconduct during summation is grounds for reversal only when the remarks caused "actual prejudice" by infecting the trial with unfairness. *See Tankleff v. Senkowski,* 135 F.3d 235, 252 (2d Cir.1998). Prejudice cannot be demonstrated in the absence of evidence of prosecutorial misconduct. *Id.* (describing three-factor test for evaluating claims of

prejudice predicated on existence of prosecutorial misconduct).

■ No prejudice exists where a prosecutor appropriately responds to defense counsel's arguments. *See United States v. Young,* 470 U.S. 1, 12–13, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.... [I]f the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction."). When responding to defense comments, "[p]rosecutors have greater leeway in commenting on the credibility of their witness when the defense has attacked that credibility." *United States v. Perez,* 144 F.3d 204, 210 (2d Cir.1998); *see also United States v. Feliciano,* 223 F.3d 102, 123 (2d Cir.2000) ("[W]hen the defense counsel have attacked the prosecutor's credibility or the credibility of the government agents, the prosecutor is entitled to reply with rebutting language suitable to the occasion.") (quoting *United States v. Thai,* 29 F.3d 785, 807 (2d Cir.1994)).

■ Viewed in light of Urena's counsel's closing arguments, the prosecutor's repetition of the phrase "don't fall for that" is properly seen as "rebutting language suitable to the occasion." *Feliciano,* 223 F.3d at 123. Each use of the phrase was responsive to specific arguments made by Urena's counsel, and each was within the prosecutor's broad discretion to rebut those arguments.

An examination of the trial transcript confirms the propriety of the prosecutor's summation. Urena's counsel argued during his summation that it was possible that James got the crack cocaine from somewhere else since there was no testimony as

to where she got the crack pipe. (Tr. at 210–11.) His counsel then called attention to the fact that when the police arrested Urena, he did not have "another dozen tinfoil packages" in his pocket, suggesting that the jury should consider it relevant that Urena did not have drugs on his person when he was arrested. (Tr. at 217.) Next, his counsel argued that the detectives were not able to view the transaction between Urena and James because of vehicular traffic, pedestrians, and a fence obstructing the view, and that in addition, the detectives, who were the only eyewitnesses to the alleged transaction, did not use binoculars or a telescope with a telephoto lens that would have enabled them to actually see the transaction. (Tr. at 213.) His counsel then argued that by claiming that he was "about 100 feet" from Urena even though "he knew the answer was 112 feet," Rivera deliberately tried to mislead the jury. (Tr. at 215–16.)

The prosecutor responded to each of these assertions in part by using the rhetorical comment, "don't fall for that." In referring to Urena's counsel's assertion that James may have gotten the crack cocaine from somewhere else, the prosecutor argued that it was unlikely that James was simply walking on the streets purposelessly holding onto crack cocaine, concluding her argument with, "Don't fall for that. We're not talking about cigarettes." (Tr. at 236.) Responding to the implication that Urena could not be convicted if he did not have drugs on him when he was arrested, the prosecutor stated, "I don't have to prove to you that [Urena] had drugs on him after the sale in order to prove that a sale occurred.... Don't fall for that." (Tr. at 238.) Next, the prosecutor addressed the claim that the NYPD detectives assumed that they witnessed a drug sale transaction without actually observing

it, arguing that "drug transactions are not overt operations.... They are covert by design.... [W]e don't expect that the defendant would be standing on the corner yelling out, okay, now I am handing out crack, it didn't happen like that because it doesn't happen like that. Don't fall for that." (Tr. at 243–44). In response to the claim that there was no evidence other than eyewitness accounts, the prosecutor stated:

> We all know that type of evidence while not necessary to have is not the only source of the truth[;] the lack of video or photograph of a crime doesn't make it any less real. It doesn't mean it didn't happen. Don't think that without that evidence you cannot be convinced beyond a reasonable doubt. Don't think without that evidence you cannot convict. Don't fall for that.

(Tr. at 245–46).

Finally, the prosecutor responded to the credibility issues submitted by the defense counsel, punctuating her position that the detectives did not single out Urena, go to that corner looking for him, or have difficulty in seeing the interaction with James, by stating, "They had a job to do. This is the law. Don't fall for that." (Tr. at 248.)

The Appellate Division held that "the challenged portions of the prosecutor's summation were responsive to defense arguments and did not exceed the broad bounds of rhetorical comment permissible in closing argument." *Urena II*, 760 N.Y.S.2d at 319. This Court agrees with that conclusion.

Because Urena cannot demonstrate that it was error to permit the prosecutor to make the challenged statements, he cannot prove that the admission of these statements violated his due process rights.

Consequently, he cannot receive habeas relief on this basis.

## C. *THE JURY QUESTION*

Finally, Urena argues that the judge in the trial court failed to give a meaningful response to a jury question during deliberations and that this failure resulted in the denial of a fair trial. In a note to the judge, the jury asked five questions, the first four of which concerned circumstantial evidence:

> [1] "We the jury request that the Judge review the law on circumstantial evidence". Under that it says: [2] "What is circumstantial evidence?" Then it says: [3] "How can circumstantial evidence be used in determining a verdict"? Under that: [4] "Can we find [Urena] guilty if we think the detectives did not see the actual piece of tinfoil handed to Harriet James"?

(Tr. at 288.)

After defense counsel and prosecution argued their positions to the judge as to how to answer the fourth question, the judge decided that he could not answer it with a "yes, no." (Tr. at 289–91.) Defense counsel asked if the judge was "going to ignore the question." (Tr. at 292.) The judge instead chose to inform the jury that its fourth question "cannot be answer[ed] with a yes, no answer. And I will not answer it with a yes, no. It can't be." (Tr. at 300.)

Urena can only prevail on his habeas claim if, as with the admission of uncharged evidence, the judge's response "so infected the entire trial that the resulting conviction violates due process." *Estelle,* 502 U.S. at 72, 112 S.Ct. 475 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)); *Davis v.*

*Strack,* 270 F.3d 111 (2d Cir.2001); *see also Cupp,* 414 U.S. at 146, 94 S.Ct. 396 ("Before a federal court may overturn a conviction resulting from a state trial in which this instruction was used, it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). Analysis of a judge's answer to a jury question follows the same reasoning utilized by a reviewing court to consider jury instructions provided by the trial judge. *See, e.g., Weeks v. Angelone,* 528 U.S. 225, 120 S.Ct. 727, 145 L.Ed.2d 727 (2000) (utilizing case law regarding general jury instructions to analyze judge's answer to jury question); *Ortiz v. Artuz,* 113 F.Supp.2d 327, 339 (E.D.N.Y.2000) (applying the jury charge analysis under *Estelle* and *Cupp* to trial court's response to jury question). In general, the "scope of review on a habeas petitioner's claim that he was deprived of a fair trial by errors in the charge to the jury is very narrow." *Ortiz,* 113 F.Supp.2d at 339 (citing *Estelle,* 502 U.S. at 73, 112 S.Ct. 475). Further, "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil,* 541 U.S. 433, 437, 124 S.Ct. 1830, 158 L.Ed.2d 701 (2004). To determine the effect of the answer on the validity of Urena's conviction, "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Id.* (quoting *Boyde v. California,* 494 U.S. 370, 378, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)).

The Court concludes that Urena has not met this high standard. It agrees with the Appellate Division, which considered the answer within the context of the jury instructions and the other questions asked

by the jury, and concluded that the trial court "provided a meaningful response when it properly advised the deliberating jury that its question regarding the interpretation of circumstantial evidence could not be answered with the simple 'yes' or 'no' called for by the question." *Urena II*, 760 N.Y.S.2d at 319. The Appellate Division also recognized that "[i]n view of the overwhelming evidence of defendant's guilt, the court's response could not have caused any serious prejudice." *Id.*

■ The trial court's response to the question rested within its considerable discretion. As the Supreme Court has stated:

> Once the judge has made an accurate and correct charge, the extent of its amplification must rest largely in his discretion. The trial judge, in the light of the whole trial and with the jury before him, may feel that to repeat the same words would make them no more clear, and to indulge in variations of statement might well confuse. How far any charge of technical questions of law is really understood by those of lay background would be difficult to ascertain, but it is certainly more evident in the living scene than in a cold record.

*United States v. Bayer*, 331 U.S. 532, 536–37, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), *quoted by Ortiz*, 113 F.Supp.2d at 339. Urena does not contend that the trial court's original charge regarding circumstantial evidence was incorrect, nor can he reasonably argue that the trial court's response to the jury question was prejudicial to him. Urena *could have been*, and apparently *was*, convicted based on circumstantial evidence that he sold the crack contained within the tinfoil to James. The trial court could have properly answered "yes" to the jury question.

The trial court did not do so, perhaps to avoid prejudicing Urena by leading the jury to believe that it was *required* to convict him based on the circumstantial evidence of his guilt or, it appears from the record, due to the absence of testimony concerning the officers' direct observation of an exchange of tinfoil between Urena and James. Consequently, the trial court's decision to decline to answer "yes" or "no" to the question could not have been harmful to Urena. Moreover, its decision to avoid further amplification of the standards pertaining to circumstantial evidence was within its discretion. *See Bayer*, 331 U.S. at 536–37, 67 S.Ct. 1394; *Wu v. O'Keefe*, No. 92 Civ. 6651, 1994 WL 30424, at *3 (S.D.N.Y. Feb.2, 1994) (stating that it was within the trial court's discretion not to give a "yes or no" response to a jury question).

Urena cannot establish that the trial court's answer to this question in some way prejudiced the jury deliberations, or that the response made his trial fundamentally unfair. Therefore, the trial judge's response to the jury question, which was affirmed by the Appellate Division, was not contrary to or an unreasonable application of Federal law as determined by the Supreme Court. *See* § 2254(d)(1).

## III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the petition of Angel Urena ("Urena") for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is DENIED.

Because Urena has failed to make a substantial showing of denial of a constitutional right, the Court declines to issue a certificate of appealability. *See* 28 U.S.C. § 2253(c).

The Clerk of Court is directed to close this case.

**SO ORDERED.**